IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARANDA SHOEMAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV441 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Maranda Shoemaker ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on September 1, 2015, alleging a disability onset date of April 30, 2007, later amended to September 1, 2015. (Tr. at 185-90,

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

36.)[2]  Her application was denied initially (Tr. at 77-93, 111-14) and upon reconsideration (Tr. at 94-110, 122-30).  Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ").  (Tr. at 132-34.)  On September 12, 2017, Plaintiff, along with her attorney and an impartial vocational expert ("VE"), attended the subsequent hearing.  (Tr. at 33-76.)[3]  The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 12-27), and, on March 11, 2019, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6, 180-84).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, the scope of review of such a decision is "extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  "The courts are not to try the case de novo."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992)

---

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #8].
[3] At the hearing, Plaintiff amended her alleged onset date to September 1, 2015, the date she filed her SSI application.  (See Tr. at 36, 43.)

2

(quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

---

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on

---

disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 17.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> Sjogren's Syndrome, Gaucher's Disease, Anencephalus and Catastrophic Congenital Abnormality or disease, Dysfunction of major joints, anxiety disorder, affective disorder, somatoform disorders, headaches, and peripheral neuropathy.

---

hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

(Tr. at 17.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 18-20.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations. Specifically, the ALJ found that Plaintiff could:

> lift[ ] and/or carry twenty pounds occasionally and ten pounds frequently; sit[ ] for six hours, stand[ ] for six hours and walk[ ] for six hours; [Plaintiff] can push/pull frequently with the bilateral upper extremities. [Plaintiff] can climb ramps and stairs occasionally and never climb ladders, ropes, or scaffolds, balance frequently, stoop frequently, kneel frequently, crouch frequently, and crawl frequently. She is limited to hearing and understanding simple oral instructions. In understand, remember and carryout instruction, [Plaintiff] is limited to perform simple, routine tasks. In use of judgment, [Plaintiff] is limited to simple work-related decisions. [Plaintiff] is able to respond appropriately to the public occasionally. In dealing with changes in a work setting, [Plaintiff] is limited to simple work-related decisions.

(Tr. at 20.) At step four of the analysis, the ALJ determined that Plaintiff had no past relevant work. (Tr. at 25.) However, the ALJ concluded at step five that, given Plaintiff's age, education, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 25-26.)

Plaintiff now raises three challenges to her RFC assessment. First, she contends that "[t]he ALJ erred by failing to account for the vocational effects of Plaintiff's Cerezyme infusions in the RFC." (Pl.'s Br. [Doc. #11] at 4.) Next, she argues that "[t]he ALJ erred by failing to adequately account for Plaintiff's well documented chronic fatigue when assessing the RFC." (Id. at 9.) Third, Plaintiff maintains that "[t]he ALJ erred in her evaluation of the medical opinion evidence." (Id. at 11.) After a careful review of the record, the Court agrees

6

that remand is necessary, in particular to address the limitations related to Plaintiff's bi-weekly enzyme infusions.

A.  Cerezyme Infusions

In her first issue on review, Plaintiff asserts that "[t]he ALJ erred by failing to account for the vocational effects of Plaintiff's Cerezyme infusions in the RFC." (Pl.'s Br. at 4.) More specifically, Plaintiff points out "that she experiences body pain and chronic fatigue due to Gaucher's Disease, from which she has suffered since childhood," and that "[s]he receives enzyme replacement therapy ('ERT')" in the form of Cerezyme "intravenously every two weeks due to this genetic enzyme deficiency." (Id.) Plaintiff further notes that her "infusions last about three and a half hours each," and that "she will be receiving them for the rest of her life." (Id.) According to Plaintiff, that "description of her condition is consistent with the statement of her treating specialist at Duke University Medical Center . . . since childhood, Dr. Priya Kishnani, issued on July 14, 2017." (Id. at 5 (citing Tr. at 626).) Dr. Kishnani's letter provides that:

> [Plaintiff] is a long standing patient with the Duke Metabolic/Biochemical Clinic. [She] was initially diagnosed with Gaucher disease at age 7 years old. She has been followed at the Duke Clinic since 1994. Her diagnosis has been confirmed by mutation analysis.
>
> Gaucher disease is a rare inherited genetic condition that causes fatty deposits to build up in certain organs and bones. . . . Fatigue and bone disease are commonly reported by patients with Gaucher disease. These are both often disabling and can affect quality of life. . . . Treatment for Gaucher disease is available through medicines that are intravenous enzyme replacement therapies (ERT). These medicines are not a cure of the disease. ERT can help improve symptoms related to Gaucher disease. In order to benefit from the treatment, patients must receive this infusion consistently for the rest of their lives, typically prescribed every 2 weeks. [Plaintiff] began ERT treatment in 1992. Despite treatment, [Plaintiff] continues to report significant fatigue, pain,

7

> bruising, and bleeding. . . . . [Plaintiff] should continue to receive enzyme replacement infusions for treatment of Gaucher disease. We recommend consistent treatments for best management of Gaucher disease.

(Tr. at 626).

Plaintiff maintains that, "[t]hough the ALJ found that [Plaintiff's] Gaucher's Disease constituted a severe impairment, . . . [n]o absences due to these infusion sessions are included in the RFC and nowhere in the decision does the ALJ explain why this is the case." (Pl.'s Br. at 6 (internal citation omitted) (citing Tr. 17, 20).) Plaintiff emphasizes that the ALJ's error in this regard "was very harmful as the record repeatedly notes the frequency and duration of [Plaintiff's] Cerezyme infusion sessions" (id.), and the VE "testified that if [Plaintiff] . . . missed two days o[f] work per month, she would be unemployable" (id. at 4 (citing Tr. at 74)).

RFC measures the most a claimant can do despite any physical and mental limitations. Hines v. Barnhart, 453 F.3d 559, 562 (4th Cir. 2006); 20 C.F.R. § 416.945(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562-63; 20 C.F.R. § 416.945(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 416.967. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 416.969a(c). An ALJ need not discuss every piece of evidence in making an RFC determination. See, e.g., Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995). However, the

8

ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

As Plaintiff correctly asserts, the ALJ in the present case failed to consider the impact of Plaintiff's Cerezyme infusions on her RFC. Defendant does not dispute that the medical record reflects the importance of Plaintiff receiving enzyme infusions every two weeks, including that Dr. Kishnani recommended that she "really try to not put off infusions even by a few days." (Def.'s Br. [Doc. #13] at 5 (quoting Tr. at 853); see also Tr. at 294, 309, 626, 831, 849, 853, 875, 921, 924). In addition, the medical record reflects that Plaintiff's infusion time was extended to avoid adverse reactions, with infusion time of 2 to 2.5 hours followed by 30 minutes observation, and with records reflecting that the visits last 3 to 5 hours. (Tr. at 875, 639 (9:00 am – 12:40 pm), 642 (8:35 am – 12:40 pm), 645 (10:40 am – 2:30 pm), 648 (9:40 am – 2:40 pm), 653 (8:30 am – 11:40 am), 656 (8:30 am – 12:10 pm), 658 (8:25 am – 11:35 am). Likewise, to avoid adverse reactions, Plaintiff was kept on a two-week schedule, rather than a higher dose once a month. (Tr. at 924.) In addition, in the notes of Plaintiff's medical visits on October 24, 2014 and June 13, 2016, Dr. Kishnani noted that Plaintiff "cannot work due to pain and treatment." (Tr. at 876, 903). At the hearing, counsel for Plaintiff presented the need for treatment as a primary issue, noting that:

> [S]he has for a considerable length of time been receiving infusion treatments and those treatment Your Honor, she has them every two weeks. When she actually sits down to have the infusion treatment at the Scotland Hospital, it takes about three and a half hours to do the infusion treatment. That's if everything goes well. Sometimes she has some problems where she has to stay there and recover longer than that. . . . I would argue that because of the significant amount of time she would receive just because of the infusion treatments, it would make it I think the vocational expert would agree that

9

missing that much time from work would probably keep her from working a competitive job.

(Tr. at 38-39.) This presentation was followed by Plaintiff's testimony regarding the infusion treatments at length. (Tr. at 48-49, 62-63.)

The ALJ's decision acknowledges that Plaintiff has "received enzyme replacement since October 1992." (Tr. at 21). The ALJ also noted that Plaintiff testified to getting treatments every two weeks in 2017. (Tr. at 23.) However, in reviewing Dr. Kishnani's opinion, the ALJ did not address the need for continued enzyme treatment every 2 weeks. (Tr. at 25.) Most notably, the ALJ did not discuss at all the impact of the bi-weekly treatments on Plaintiff's ability to work.

Defendant attempts to minimize the effect this omission by arguing first that medical appointments are not an appropriate consideration for assessing a claimant's residual functional capacity. (Def.'s Br. at 17.) However, in this case the contention is not simply that Plaintiff may have various medical appointments, but rather that treatment of Plaintiff's severe impairment requires bi-weekly infusions with treatment taking 3 to 5 hours each time. Social Security guidance makes clear that "[t]he RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p: <u>Policy Interpretation Ruling Titles II And XVI: Assessing Residual Functional Capacity In Initial Claims</u>, 1996 WL 374184, 61 Fed. Reg. 34474, 34477 (July 2, 1996); see <u>Payne-Hoppe v. Comm'r of Soc. Sec.</u>, No. 1:11-cv-97, 2012 WL 395472 (S.D. Ohio Feb. 7, 2012) (remanding where the plaintiff required bi-

10

weekly injections for a chronic condition requiring several hours in the clinic for each dose, and finding that the ALJ should have inquired "whether a 'scheduled' absence of the same length would preclude competitive employment, or whether employers of the unskilled, sedentary jobs listed by the VE would tolerate the number of absences plaintiff would experience due to her regularly scheduled Soliris infusion treatments"); Miller v. Astrue, No. 1:12-cv-16, 2012 WL 6644390 (S.D. Ohio Dec. 20, 2012) (remanding for further fact-finding where the plaintiff's treatment required her to spend approximately 2 hours at the doctor's office each week for injections), adopted 2013 WL 360375 (concurring that "the ALJ failed to develop evidence with the vocational expert whether an employer would tolerate such absences from work or whether there are a significant number [of] jobs available on different shifts that Plaintiff could perform without being absent from work"); Filmore v. Saul, No. 4:18 CV 1609 ACL, 2019 WL 4576300, at *7-8 (E.D. Mo. Sept. 20, 2019) ("The ALJ did not discuss whether the alleged work absences stemming from the IVIG therapy were supported by the record, or why work absences were not included in Filmore's RFC. . . . If the ALJ did not believe Filmore's IVIG treatment would necessarily result in two or more work absences a month, there is no indication of this in his opinion. Because the medical evidence and Filmore's testimony support this degree of absenteeism, at least for the twelve-month period of 2010, the ALJ erred in not discussing this issue. This error is not harmless, as the vocational expert testified that competitive work would be precluded if an individual would consistently miss two or more days of work a month.").

"To be clear, the Court is not saying that frequency of medical appointments alone renders a claimant disabled . . . [b]ut the ALJ must still consider the effects of a claimant's

11

treatment in conjunction with the other evidence of record." Kim J. H. v. Saul, No. 18-cv-2736, 2020 WL 872308, at *11 (D. Minn. Jan. 28, 2020) (remanding case based on ALJ's failure to consider absences caused by medical treatment); see also Goodman v. Berryhill, No. C17-5115 BAT, 2017 WL 4265685, at *3 (W.D. Wash. Sept. 25, 2017) (explaining that "the proper focus must be the functional limitations and restrictions resulting from medically determinable impairments," and rejecting the view that "frequency of medical appointments alone can be considered a disabling medical impairment" because "[a]ccepting such a proposition would presume disability for anyone who frequently visited a doctor regardless of the necessity of the treatment or the medical prognosis" but noting that "[t]his is not to say that frequency of medical treatment is irrelevant; rather, it means that to be disabling, the frequency of medical treatment must be necessitated by the medical condition and be substantiated by the evidence.").[6]

"It remains Plaintiff's burden to show that the frequency of her treatments is a limitation that should have been accounted for at Step 4 of the sequential analysis." Miller, 2012 WL 6644390, at *10. In this case, Plaintiff has presented uncontested evidence—through her testimony, the medical records of her treating physician Dr. Kishnani, and the medical records of her infusions—that treatment of her Gaucher disease requires infusions every 2 weeks, with appointments generally lasting 3 to 5 hours. The ALJ did not consider or address the resulting limitations. Moreover, it is Defendant's burden at step 5 to establish the availability of other employment, but neither the ALJ nor the Vocational Expert addressed

---

[6] As noted in Goodman, the regulations reflect the consideration of treatment when it is linked to a relevant medical condition "for example, via Listing 6.03, which presumes disability for kidney disease with chronic hemodialysis or peritoneal dialysis." Goodman, 2017 WL 4265685 at *3.

12

Case 1:19-cv-00441-TDS-JEP   Document 14   Filed 08/31/20   Page 12 of 16

whether the identified positions could accommodate that treatment schedule. See id. ("Also missing from the record, at Step 5 of the sequential analysis, is any vocational expert testimony as to whether an employer would permit weekly absences for treatment given the type of jobs that Plaintiff could perform, or alternatively, whether a significant number of jobs might be available on different shifts, so that Plaintiff could sustain full-time work without having to be absent from work.").

Defendant also argues that Plaintiff's infusions were further apart than two weeks during at least some portion of her alleged disability period, and that, even if Plaintiff had infusions every two weeks, as scheduled, she fails to show that these appointments would cause her to miss two or more days of work per month. (Def.'s Br. at 18-20.) Regarding the latter argument, Defendant, without support, contends that Plaintiff could work partial days or schedule her infusion appointments outside of work hours. However, there is no evidence that the ALJ considered these possibilities, let alone questioned Plaintiff about them or presented them as hypothetical questions to the vocational expert at step five of the sequential analysis. See Kim J.H., 2020 WL 872308 at *11 ("It may be that Plaintiff is not entitled to a period of closed disability for some or all of these 33 months, whether due to . . . an employer's tolerance for full and half days, or some other reason. Or, based on the record as a whole, it may be that Plaintiff would be absent from work less than two days per month, which the vocational expert testified would be tolerated by an employer. These considerations, and the Commissioner's arguments as to the precise period of time in which Plaintiff may be eligible for disability benefits, are best addressed by the ALJ and the vocational expert in the first instance. Considering the evidence in the record regarding the extent and frequency of

13

Plaintiff's treatment, the ALJ must explain how this course of treatment is reconcilable with the vocational expert's testimony regarding tolerated absences in a manner that allows the Court to determine whether the ALJ's conclusion that Plaintiff would not be absent two or more days per month is supported by substantial evidence in the record as a whole." (internal citations omitted)). To undertake this analysis in the first instance would usurp the ALJ's role as fact finder. See Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943) (courts must review administrative decisions on the grounds upon which the record discloses the action was based); Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. March 25, 2014) (noting that this Court's "[r]eview of the ALJ's ruling is limited further by the so-called 'Chenery Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions. Under the doctrine, a reviewing court must judge the propriety of [agency] action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." (quotations and citations omitted)). Here, in assessing Plaintiff's RFC, the ALJ did not consider "effects of treatment, including limitations or restrictions imposed by the mechanics of treatment" related to Plaintiff's bi-weekly infusions at step four of the sequential evaluation process as required by SSR 96-8p, and did not obtain evidence from the vocational expert regarding the availability of employment in light of those limitations. Given the ALJ's failure to address or consider this issue at all, substantial evidence fails to support the ALJ's decision, and remand is required to allow the ALJ to consider the effect of Plaintiff's treatment on her

ability to work. Having reached this conclusion, the Court need not consider Plaintiff's remaining contentions.[7]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claim in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #12] should be DENIED, and Plaintiff's Motion for Judgment on the Pleadings [Doc. #10] should be

---

[7] Plaintiff also contends that the ALJ failed to fully consider her fatigue, including the treatment records reflecting her persistent fatigue even with the enzyme treatments. (Pl.'s Br. at 9-10 (citing Tr. at 297, 333, 403, 427, 432, 439, 441, 462, 478, 562, 568, 626, 676, 854)). With respect to fatigue, the ALJ acknowledged Plaintiff's testimony that "[s]he had to rest if completing household chores" and that, "[w]hen fatigued, her husband cooks and complete[s] household chores," but found her "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 21.) Plaintiff challenges that conclusion, and points to not only her self-reports of fatigue, but her providers' notations linking this fatigue to chronic anemia, nutrition issues, and Gaucher Disease. Plaintiff also points to objective observations of fatigue including a mental health provider's January 2013 note that Plaintiff appeared to be a "thin, tired young woman" (Tr. at 403), and a remark by consultative medical examiner Dr. Elaine A. Staten that Plaintiff appeared fatigued (Tr. at 480). This alleged error overlaps with Plaintiff's third assignment of error in that both have bearing on Plaintiff's ability to stay on task. Plaintiff challenges the ALJ's "assignment of 'partial weight'" to the opinions of consultative psychological examiner Clyde A. Collins, LPA (working under the supervision of Dr. William Link) "without explaining which aspects of the opinion the ALJ found persuasive and why." (Pl. Br. at 12.) Plaintiff contends that the ALJ's "error was harmful as [LPA] Collins and Dr. Link opined that [Plaintiff's] cognitive skills would allow her to 'perform simple repetitive tasks for 15-20 minute periods of time'" (id. at 12-13 (quoting Tr. at 490)), and "the VE testified that if [Plaintiff] were off task 15% of the time, she would be unemployable" (id. at 13 (referencing Tr. at 74).) Because, as noted in conjunction with the first issue, the ALJ did not adequately consider Plaintiff's potential absenteeism and limitations due to her infusions and convey these limitations to the vocational expert at step five of the sequential analysis, this matter merits remand. To the extent that Plaintiff's contentions regarding her fatigue and LPA Collins' opinion further impacts Plaintiff's abilities in these areas or otherwise, the ALJ can fully consider these issues on remand.

GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 31st day of August, 2020.

/s/ Joi Elizabeth Peake
United States Magistrate Judge